THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MARLON THOMAS, Defendant-Appellant.

First District (5th Division)    No. 79-2382

Opinion filed March 27, 1981.—Rehearing denied April 20, 1981.

Howard T. Savage, of Chicago (Howard O. Edmond, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Warren A. Zimmerman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of the murder of Gina Somodi (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1 and 9—1(a)(2)) and sentenced to a term of 25 to 50 years. On appeal, he presents these issues for review that: (1) his arrest, statements and use of evidence derived from these statements deprived him of constitutional due process; (2) the juvenile court committed reversible error and deprived him of due process in transferring his case to criminal court; and (3) whether by excluding his statements and evidence derived therefrom, he was proven guilty beyond a reasonable doubt. We affirm. The pertinent facts follow.

At the transfer hearing held pursuant to the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, par. 702—7(3)), Officer Dennis Banahan related that he conversed with Louis Clark in his investigation of the homicide of Gina Somodi. He stated that Clark told him that he went to defendant's home around 6 p.m. on March 6, 1974. Defendant went to the basement and returned with a .38-caliber revolver. They stayed in the kitchen for a few minutes and then went to James Houston's home where defendant attempted to buy some bullets for the revolver. Banahan indicated that Clark further stated that they then went to a house of a friend where they played some records and left, walking back towards their neighborhood at 92nd and Woodlawn.

Clark heard defendant make a racial remark as a white male and a white female passed them on the street. The white male stopped and stated, "What is your problem?" The white female victim, Gina Somodi, pulled on her friend's arm and they continued walking. Clark related to Banahan that defendant pulled the revolver from his waistband and said, "You had better freeze by the time I count to five." Gina and her friend did not turn around and continued to walk. Defendant fired once, whereupon Clark began running. Defendant fired again and caught up with Clark at 93rd Street, telling him, "I hit the girl."

The trial court denied defense's motion for a directed finding against the transfer and defendant called probation officer John Martin.

Martin enumerated the facilities and programs available to the juvenile court in the treatment and rehabilitation of a minor. He indicated that his "gut feeling" was that defendant would not need to be incarcerated beyond his minority; however, he would have to consider the report from the juvenile clinical services.

Reference to the social investigation report indicated that defendant was in the eighth grade at the time of the hearing. Martin stated that a teacher had confiscated a knife from defendant when he was in the fourth or fifth grade, which he carried because he had been subject to racial attacks going to and from school.

The State also inquired about a statement defendant made in school, "I will get a gun and shoot you." Martin indicated that a teacher overheard this remark and further he did not think this statement was directed to any teacher.

Sister Mary Everett Taksas testified that she was defendant's eighth grade teacher and had been his sixth grade teacher and seventh grade math teacher. She stated that she found defendant to be a cooperative boy, but a follower who needed self-assurance constantly. She did not consider him a troublemaker and had never known him to be in trouble with the police. She related that she sometimes walked the students two blocks to make sure the white boys would not harass them.

Defendant's father, Samuel Thomas, indicated he was divorced from defendant's mother and defendant had been living with him since the previous May. He described defendant as a follower and further stated that he had no problems with him.

Defendant's mother testified that she had remarried and perhaps defendant resented her remarriage. She considered him obedient, creative and adventurous.

The case was continued to allow for a clinical examination of defendant. Following the clinical, Martin was recalled as a witness and expressed his opinion that defendant did not need to be incarcerated and further that the psychiatrist was not recommending incarceration. He stated that until the instant offense, it appeared that defendant was an obedient and well-adjusted boy.

In ordering the case to be transferred from juvenile court to criminal court, the court found that the murder was committed in an aggressive and premeditated manner; defendant was over the age of 13; the facilities available to the criminal court were the same as the facilities available to juvenile court and further that the best interests of the minor and security of the public required that defendant remain incarcerated beyond his minority.

Prior to trial, defendant filed a motion to quash his arrest and suppress all oral statements and physical evidence. At the hearing, defendant testified that at the time of his arrest at about 3 a.m. on the morning of March 7, 1974, he was 13 years old. He stated that the police officers did not have a warrant for his arrest, and they had not witnessed the commission of the crime.

James Ward, the boyfriend of the deceased, told police officers that on March 6, 1974, he and Gina walked past two black youths on the corner of 92nd and Woodlawn and racial slurs were exchanged. He wanted to stop, but Gina told him to keep walking. Ward heard one of the youths yell, "Stop or you're dead." Two shots were fired, and Gina fell to the ground, dead. He then saw the two youths running south on Woodlawn. Ward described the taller of the two as being 5 feet 8 inches to 5 feet 9 inches tall, 16 to 19 years of age, 150 pounds, dark-complected and wearing dark clothing. He described the second youth as being 5 feet 5 inches tall and "skinny."

An eyewitness to the shooting, Mr. Gopfert, told police that he was looking out the window of a tavern on the southwest corner of 92nd and Woodlawn. A white couple walked east on 92nd Street, and he saw two black youths, one large male and a shorter person he believed to be a female. The taller youth pulled out a .32- or a .38-caliber revolver from under his coat, held it against a building and fired two shots. He and his companion then fled south on Woodlawn.

One of the investigating officers testified that an examination of the body indicated the single bullethole was made by a caliber larger than a .22, and a spent .38-caliber bullet was found near the body.

Sometime later that night, the police received an anonymous telephone call identifying the killer as James Houston. Houston was contacted, and he was able to establish that he had been home all evening. He did tell police, however, that defendant and one of defendant's friends had visited him about 9 p.m. and tried to buy .38-caliber ammunition. He described defendant's friend as being short. He then showed the police where defendant lived.

Defendant was arrested at his home where he lived with his father at about 3 a.m., and he appeared to fit the general description in the police report. One of the arresting officers described him as being 5 feet 8 inches or 9 inches tall, weighing 150 pounds, dark-complected, and he appeared to be 18 or 19 years old. At the time of his arrest, he told police officers he did not know where his father was or when he would return. Defendant was given *Miranda* warnings and taken to police headquarters.

At the police station, defendant was handcuffed by one hand to a restraining ring in an interrogation room. Between 3:30 a.m. and 6 a.m., the police had four conversations with defendant. During the first conversation, which lasted about 5 minutes, defendant denied involvement in the shooting and informed police officers he was 13 years old. A police officer thereupon made attempts to locate his parents and notified the youth officer. Defendant's father arrived about an hour and a half later and took part in the fourth conversation. Defendant's mother arrived after the father and apparently did not take part in any conversations. The youth officer arrived sometime after the third conversation.

At the second conversation, which lasted 3 to 5 minutes, defendant was confronted with the statement of James Houston. Defendant continued to deny involvement in the shooting but admitted having tried to buy ammunition from Houston in the company of Louis Clark. Clark was taken into custody and questioned in the presence of his parents. Clark told the police officers that he and defendant were in the vicinity of 92nd and Woodlawn when they were passed by a white couple. Defendant made a comment to the white male, but the couple kept walking. Defendant made another comment, and the white male turned around and said, "What do you have some kind of problem." The girl kept pulling at her boyfriend's arm, told him not to make any trouble and they continued walking away. Defendant then drew a gun from his waistband and said, "You better stop by the time I count to five." Clark said defendant counted off to five and fired one shot. Clark began running, and then defendant fired a second shot and ran after him.

The third conversation began about 4:30 a.m. and lasted 10 to 15

minutes. Defendant was confronted with Clark's statement, and he apparently made some admissions at that time. A fourth conversation took place at about 5:30 a.m. in the presence of defendant's father, and he apparently made further admissions. At the conclusion of that conversation, defendant's father signed a form agreeing to the search of his house. Two police officers and defendant's father then searched the basement and found a .38-caliber revolver and a dark-colored jacket behind the furnace.

The police officers testified that defendant was advised of his constitutional rights before each conversation, and defendant indicated that he understood those rights. They characterized his attitude as alert, belligerent and sure of himself. He did not appear to be frightened.

The trial court sustained the motion to quash the arrest and suppress all oral statements but denied it insofar as the suppression of physical evidence. The State appealed the denial pursuant to Supreme Court Rule 604(a)(1) (Ill. Rev. Stat. 1975, ch. 110A, par. 604(a)(1)). The issues on appeal were the voluntariness of defendant's statements and whether the police had probable cause to arrest defendant. We reversed the judgment of the trial court and remanded the matter for trial under Supreme Court Rule 23 (Ill. Rev. Stat. 1977, ch. 110A, par. 23), finding that the facts in possession of the police at the time of the arrest were sufficient to establish probable cause for the arrest and further that defendant's statements were voluntarily made after being repeatedly advised of his constitutional rights. See *People v. Thomas* (1978), 66 Ill. App. 3d 1113, 387 N.E.2d 1300.

At trial, Clark testified that after leaving school on March 6, 1974, he went with defendant to defendant's grandfather's house. Defendant went through the various rooms of the house and reappeared holding a gun. They left the grandfather's house and went to a prairie, where he fired the gun in the air. He returned the gun to defendant and agreed to meet him later on. Clark went to defendant's house later and they conversed in the kitchen. They then went across the street to Jimmy Houston's house and obtained some bullets. They went to the home of another friend, where they listened to some records for approximately 15 minutes and then left.

As they walked towards home on 92nd and Woodlawn, they passed a male and female couple walking in the opposite direction. Defendant made a remark and the white male turned and asked, "Do you have a problem?" The female pulled on her companion's arm and they continued walking. Defendant said, "Stop, or you are dead, man." As the couple continued walking, defendant ordered, "Freeze by the time I count to five." He then fired the gun and Clark stated that he turned and ran. Defendant fired a second time and then ran to catch up with Clark at 93rd and Woodlawn, telling him that he had hit the girl. They both went home.

Clark testified that on the day in question he was 4 feet 11 inches tall and weighed 100 pounds.

Ward testified that he began to walk Gina home around 10 p.m. on the day in question when they encountered two black youths on 92nd and Woodlawn. He testified to the exchange of words between him and defendant and then stated that Gina fell from the second of two shots fired after defendant stated "Stop or you're a dead man." He described the taller individual as 5 feet 9 inches, weighing approximately 150 pounds and appearing to be 16 years old. The shorter individual was about 5 feet tall and may have been a female. Ward viewed a lineup at the police station the next morning but was not able to make an identification.

Officer John Yucaitis testified concerning defendant's arrest and statements. Houston had been taken into custody but established that he had been home throughout the evening. As a result of a further conversation with Houston, the police went to defendant's house on March 7 at 3 a.m. He was informed that he was a suspect and was escorted to police headquarters where he was again advised of his constitutional rights. Defendant then stated that he had been watching television all evening and denied knowing Houston. Defendant was confronted with Houston's statement that he had come by his house earlier in the evening of March 6 with another individual and attempted to purchase some ammunition. He then named Clark and took the police to Clark's house.

Defendant was informed that Clark implicated him in shooting the girl, whereupon he admitted the shooting and told the police where the gun was hidden. The investigation was explained to defendant's father and he advised his son not to give a written statement. The father consented to a search of his home, where a revolver was found behind the furnace. Defendant's father testified that he left his house sometime after dinner to play cards. He next saw his son at 5 a.m. on March 7 at the police station. He had been contacted by his son at 4:30 a.m. He stated that he never heard his son admit to a shooting nor bow his head in affirmance to any question pertaining to his involvement in the homicide. He consented to a search of his home at about 5:30 or 5:45 a.m. on March 7, 1974. He testified that the firearm in evidence resembled the firearm he kept under the furnace of his home.

OPINION

■■■ Defendant initially contends that he was denied due process of law when the police interrogated him without his parents or a juvenile officer present. Additionally, he asserts he did not validly waive his *Miranda* rights and that his confession must be suppressed. The voluntariness of defendant's statements was previously before us in November 1978 when

we reversed the suppression order entered by the trial court. We explicitly found that defendant was repeatedly advised of his constitutional rights, and abandoned his denial of involvement after being confronted with the statements of Clark and Houston. Even if it could be established that the facts were insufficient to constitute probable cause for an arrest, Clark's and Houston's statements were intervening circumstances and, therefore, defendant's confessions were voluntary. (See *People v. Thomas* (1978), 66 Ill. App. 3d 1113, 387 N.E.2d 1300.) The determination of law decided in this prior appeal precludes us from again considering this issue. (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 405 N.E.2d 1220; *Foreman v. Martin* (1975), 26 Ill. App. 3d 1028, 325 N.E.2d 378.) As such, the voluntariness of defendant's statements is no longer subject to review by this court. Moreover, even if we were to reconsider this issue, the record supports the correctness of this earlier decision. Defendant was advised of his constitutional rights at his home and twice at the police station, repeated attempts were made to reach his parents and he appeared self-assured throughout his detention. Testimony revealed that he was not questioned coercively or intimidated into giving a statement. The totality of these relevant circumstances indicates the voluntariness of defendant's statements. (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418.) Juveniles can knowingly waive their privilege against self-incrimination (*In re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428; *People v. Prude*), and it appears this was the situation in this instance.

Concomitant with defendant's argument that his confessions violated due process, he also posits that statements and evidence derived therefrom violate his right to due process. He asserts that the earlier case decided under Supreme Court Rule 23, *People v. Thomas*, did not determine the probable cause issue on constitutional grounds. This contention is manifestly incorrect as probable cause questions necessarily involve the fourth amendment (see U.S. Const., amend. IV), and thus the earlier ruling is applicable and precludes us from reconsidering this issue. *Zokoych; Foreman.*

Defendant next contends that the trial court committed reversible error when it transferred his case to Criminal Court and that such transfer violates his right to due process. Specifically, he argues that the requirements of the transfer statute (Ill. Rev. Stat. 1973, ch. 37, par. 702—7(3)(a) and the *Kent* case (*Kent v. United States* (1966), 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045) had not been met and that there were other factors to be considered. We disagree.

Due process analysis of a juvenile transfer proceeding begins with *Kent*, whose requirements are incorporated in the Juvenile Court Act (Ill.

Rev. Stat. 1973, ch. 37, par. 702—7(3)(a)), which sets forth the factors to be considered by the judge in determining whether to permit criminal prosecution of a juvenile 13 years of age or older:

> "In making its determination on a motion to permit prosecution under the criminal laws, the court shall consider among other matters:
>
> (1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment;
>
> (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner;
>
> (3) the age of the minor;
>
> (4) the previous history of the minor;
>
> (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and
>
> (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority. * * *" Ill. Rev. Stat. 1973, ch. 37, par. 702—7(3)(a).

Our supreme court held in *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366, that the State need only present sufficient evidence to persuade the trial court, in the sound exercise of its discretion, that in light of the statutory criteria, transfer is warranted.

■■ The role of the appellate court in determining the propriety of a juvenile transfer to criminal court is whether, in light of the statutory criteria, the trial judge abused his discretion. No one criterion is determinative, nor is application of equal weight to each and every criterion required. All that is required is preservation of the record which will allow meaningful review of the trial court's exercise of discretion. *People v. Cater* (1979), 78 Ill. App. 3d 983, 398 N.E.2d 28; see also *People v. Taylor*.

Our review of the record indicates there was no judicial abuse of discretion in allowing this matter to be transferred to criminal court. The evidence established that the trial court conducted a full hearing, evaluated defendant's social and clinical reports which undoubtedly indicated his prior background and prospects for rehabilitation. The court also specifically found that there was sufficient evidence on which a grand jury may return an indictment; the alleged offense was committed in an aggressive and premeditated manner; defendant was over the age of 13; the facilities available to the criminal court were the same as the facilities if he were retained under the juvenile court jurisdiction; and further that it was in the best interests of the minor and the security of the public that this minor continue in custody perhaps for a period extending beyond his minority. We therefore conclude that the juvenile court's decision to

transfer defendant was based on a consideration of *all* the statutory criteria and as such the transfer was consistent with due process.

Defendant lastly contends that by excluding his statements and the evidence derived from these statements he was not proven guilty beyond a reasonable doubt. We have already concluded that defendant's statements were admissible and as such all evidence derived therefrom could be used against him. Testimony revealed that after defendant was informed of Clark's statements, he confessed to firing the gun twice, wherein one shot struck the deceased. He also indicated the location of the weapon and police were able to recover the weapon from defendant's house. Clark identified defendant as the murderer and his testimony was substantially corroborated by two other eyewitnesses to the shooting. As such, the evidence overwhelmingly indicates defendant was found guilty beyond a reasonable doubt.

For the foregoing reasons, the judgment appealed from is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.