**UNITED STATES of America ex rel. Marlon THOMAS, Petitioner–Appellee,**

v.

**Michael O'LEARY, Respondent–Appellant.**

No. 87–2538.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1988.

Decided Sept. 16, 1988. Rehearing and Rehearing En Banc Denied Oct. 20, 1988.

Catherin L. Grahn, Grahn & Grahn, Ltd., Chicago, Ill., for petitioner-appellee.

Joan G. Fiekinger, Office of Ill., Atty. Gen., Chicago, Ill., for respondent-appellant.

Before BAUER, Chief Judge, and WOOD and COFFEY, Circuit Judges.

BAUER, Chief Judge.

Respondent-appellant Michael O'Leary, warden at Illinois's Stateville Correctional Center, appeals the district court's grant of petitioner-appellee Marlon Thomas's petition for a writ of habeas corpus. O'Leary contends that the district court erred in holding that Thomas was denied effective assistance of counsel on the State of Illinois's appeal from the state trial court's decision to suppress statements made by Thomas and a companion or, in the alternative, that any such denial was harmless error. For the following reasons, we affirm.

## I.

Late in the evening of March 6, 1974, Gina Somodi and a friend, James Ward, were walking near the intersection of 92nd Street and Woodlawn Avenue in Chicago, where they passed two other youths. Racial slurs were exchanged, and Ward asked the two youths if there was a problem. To avoid a confrontation, Somodi pulled Ward away and the two continued walking. One of the two other youths then yelled "stop or you're dead." He meant it. The same youth fired two shots, one of which entered Somodi's head. The shooter and his companion fled south on Woodlawn Avenue.

By 10:20 p.m., when Chicago Police Officer Yucaitis arrived at the scene, Somodi was dead. Yucaitis talked to Ward, who described the shooter as a black male, five-foot-eight or -nine inches tall, between sixteen and nineteen years old, 150 pounds, and wearing dark clothes. Ward described the other youth as a black male, maybe five-foot-five, and on the skinny side. Yucaitis also talked to a man named Gopfert, who witnessed the shooting through the front window of a nearby tavern. According to Yucaitis, Gopfert's description of the taller of the two youths matched Ward's, but Gopfert described the other youth as a shorter female. Gopfert also said he believed the shots were either from a .32 or .38 caliber revolver.

Sometime later that night, police received an anonymous phone call identifying Somodi's killer as James Houston, who fit one of the youth's descriptions and lived at 96th Street and Woodlawn. When the police talked to Houston, however, he was able to verify that he was home all evening. But Houston also told police that, earlier, at about 9:00 p.m. that evening, Thomas and a shorter friend had come to his home and attempted to buy .38 caliber bullets from him. Houston said he did not sell or give them any bullets.

Houston then led about ten or eleven Chicago police officers to Thomas's residence at 9628 South Woodlawn—by now, it was about 3:00 a.m. on March 7—where they found Thomas home alone in his underwear. Thomas said he lived with his father, but that he did not know his father's whereabouts. After Thomas denied knowing Houston or anything about a shooting, police arrested him, informed him of his rights, and searched his home without a warrant or consent. Police then took Thomas, handcuffed, to the police station, where he was again informed of his rights, which Thomas said he understood.

At the station, police had four conversations with Thomas between 3:30 and 6:00 a.m. on March 7. The first conversation lasted five minutes, during which Thomas denied committing murder. The second occurred when two officers, after conferring with Houston, threatened Thomas with a confrontation with Houston. This time, Thomas again denied committing murder, but admitted that he and Louis Clark, a friend, had tried to purchase bullets from Houston. Police then found Clark, who identified Thomas as the shooter, and when police confronted Thomas a third time with Clark's statement, Thomas admitted involvement in the shooting. The final conversation between police and Thomas occurred at about 5:30 a.m. when, after being advised of his rights one more time, Thomas again admitted his involvement in the shooting.

At some point after bringing him to the police station, police learned that Thomas was only thirteen years old. At that time, the police called his home, did not reach anyone, and that was it. It was not until the fourth conversation between police and

Thomas that Thomas's father, Samuel Thomas, arrived at the station. Throughout the questioning, Thomas was handcuffed to a restraining ring on the interview-room wall. He did not eat, and was not permitted to sleep. Police described him as belligerent and cocky during the interviews, but Thomas's self-confidence apparently waned by the last interview. After the fourth conversation, Samuel Thomas signed a consent-to-search form for his residence, where police recovered a .38 caliber revolver behind the furnace in the basement.

On April 1, 1974, the State of Illinois succeeded in transferring Thomas's case from the juvenile to the adult division of the Criminal Court of Cook County. After a probable cause hearing on April 30, 1974, a grand jury indicted Thomas for murder on May 27. Thomas was arraigned on June 17, 1974. On September 1, 1977, more than three years after the shooting, Thomas's attorneys moved to quash Thomas's arrest for lack of probable cause and to suppress all evidence derived from it. On September 1 and 2, 1977, Cook County Circuit Court Judge Aubrey Kaplan conducted a hearing on Thomas's motion, during which witnesses for both sides testified and were cross-examined. Judge Kaplan then granted Thomas's motion. Finding Thomas's arrest illegal, the judge suppressed Thomas's and Clark's statements, but denied Thomas's motion to suppress the physical evidence discovered at his father's residence.

The State of Illinois appealed Judge Kaplan's ruling suppressing the statements pursuant to Illinois Supreme Court Rule 604(a)(1), Ill.Rev.Stat. ch. 110A, ¶ 604(a)(1), which provides that, in criminal cases, the State may appeal from an order quashing an arrest or suppressing evidence. The State sent a copy of the Notice of Appeal to Thomas and his attorneys, as well as copies of subsequent State motions and copies of the State's brief. On October 13, 1978, the State moved to set the case for oral argument, advising the Illinois Appellate Court that the defendant had not yet filed a brief. The Appellate Court denied the State's motion on October 20, 1978. On October 30,

Illinois Appellate Court Justice Sullivan sent a letter addressed only to the State indicating that, after a review of the record and the State's brief, no oral argument was necessary.

A few days later, on November 2, 1978, Thomas's attorneys moved for an extension of time in which to file a brief on his behalf and to set the case for oral argument. On November 9, however, the appellate court, basing its decision solely on the record and the State's brief, reversed Judge Kaplan's ruling, holding Thomas's arrest valid and his statements voluntary. On November 17, eight days after the court had ruled on the merits, Justice Sullivan denied Thomas's motions for an extension of time in which to file a brief and to set a date for oral argument.

Thomas was tried and convicted of Gina Somodi's murder and sentenced to twenty-five to fifty years in prison. The Illinois Court of Appeals affirmed his conviction, *People v. Thomas*, 94 Ill.App.3d 895, 50 Ill.Dec. 372, 419 N.E.2d 480 (1st Dist.1981), and, on October 19, 1981, the Illinois Supreme Court denied Thomas's Petition for Leave to Appeal. Thomas then petitioned the state trial court for post-conviction relief, alleging, *inter alia*, that his attorneys' failure to file a brief on his behalf on the Rule 604(a)(1) appeal violated his Sixth and Fourteenth Amendment rights. After a hearing, however, Cook County Judge Vincent Bentivenga granted the State's motion to dismiss Thomas's petition. Thomas then appealed Judge Bentivenga's denial of his petition to the First District Appellate Court, Fifth Division, the same division that decided the State's Rule 604(a)(1) appeal in 1978 and his direct appeal in 1981. After Thomas unsuccessfully moved for a change of appellate court division, the court denied him relief. The Illinois Supreme Court then denied Thomas's petition for leave to appeal, over a written dissent filed by Justice Simon.

Thomas then petitioned the district court for a writ of habeas corpus, which the court granted, holding that Thomas was denied the effective assistance of counsel when his attorneys failed to file a brief on

his behalf on the Rule 604(a)(1) appeal. Respondent O'Leary appeals from that ruling, claiming that the district court erred in holding that Thomas's counsel rendered constitutionally ineffective assistance or, alternatively, that any such denial was harmless error.

## II.

### A.

■ We begin by noting that the Sixth Amendment guarantees an accused the assistance of counsel not just at trial, but whenever it is necessary to assure a meaningful defense. *United States v. Wade*, 388 U.S. 218, 225, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967). As the Supreme Court has stated,

> a person accused of a crime "requires the guiding hand of counsel at every step in the proceedings against him," *Powell v. Alabama*, 287 U.S. 45, 69 [53 S.Ct. 55, 64, 77 L.Ed. 158] (1932), and ... that constitutional principle is not limited to the presence of counsel at trial. "It is central to the principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade, supra* [388 U.S.] at 226 [87 S.Ct. at 1932].

*Coleman v. Alabama*, 399 U.S. 1, 7, 90 S.Ct. 1999, 2002, 26 L.Ed.2d 387 (1970). Thus, recognizing that "the period from arraignment to trial [is] perhaps the most critical period of the proceedings," *Wade*, 388 U.S. at 225, 87 S.Ct. at 1931, involving "critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality," *id.* at 224, 87 S.Ct. at 1931, the Court has held that the Sixth Amendment right to counsel applies to all such "critical" stages. *Coleman*, 399 U.S. at 7, 90 S.Ct. at 2002; *Wade*, 388 U.S. at 224, 87 S.Ct. at 1930.

A critical stage is one where potential substantial prejudice to defendant's rights inheres in the particular confrontation and where counsel's abilities can help avoid that prejudice. *Coleman*, 399 U.S. at 9, 90 S.Ct. at 2003. Such confrontations include, for example, the indictment, arraignment, and preliminary hearing, *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972), and sentencing, *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). Under this definition, the September 1 and 2, 1977 suppression hearing before Judge Kaplan was a critical stage of the proceedings against Thomas, at which he was entitled to receive, as he did, the effective assistance of counsel. The hearing involved two days of extensive examination and cross-examination of witnesses and legal arguments. The result was crucial, perhaps even determinative of whether Thomas would be tried at all. Suppression of both Thomas's and Clark's statements would perhaps decimate the State's case; admission would enhance greatly the likelihood of Thomas's conviction.

The State's Rule 604(a)(1) appeal from the state trial court's suppression hearing was equally as critical. Surely the result was no less crucial to Thomas than Judge Kaplan's ruling on the suppression motions. Indeed, after the appellate court reversed the state trial court's suppression of Thomas's and Clark's statements, the disputed evidence was admitted at Thomas's trial and he was convicted. Moreover, the State's appeal confronted Thomas with a new type of adversary proceeding, one that required counsel skilled in persuading a panel of appellate judges by means of a brief and perhaps oral argument. As the Supreme Court has stated, "a criminal appellant must face an adversary proceeding that—like a trial—is governed by intricate rules that to a layperson would be hopelessly forbidding. An unrepresented appellant—like an unrepresented defendant at trial—is unable to protect the vital interests at stake." *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985).

Thus, the State's 604(a)(1) appeal also was a "critical" stage of the proceedings against Thomas, at which he had the right to the effective assistance of counsel. Indeed, as the Supreme Court's decision in *Evitts* makes clear, any other conclusion also would clash with the Fourteenth Amendment's Due Process Clause. The Court held in *Evitts* that a state appellate court's dismissal of a convicted defendant's first appeal as of right, despite the ineffective assistance of the appellant's counsel in filing the appeal, violated that clause. In doing so, the Court ruled that "if a state has created appellate courts as 'an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant,'" as Illinois has done with its Rule 604(a)(1) provision, "the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts*, 469 U.S. at 393, 105 S.Ct. at 834 (citation omitted). And, the court added, "the services of a lawyer will for virtually every layman be necessary to present an appeal in a form suitable for appellate consideration on the merits." *Id.* at 393, 105 S.Ct. at 834.

### B.

The Sixth Amendment right to counsel, of course, guarantees more than just a warm body to stand next to the accused during critical stages of the proceedings; an accused is entitled to an attorney who plays a role necessary to ensure that the proceedings are fair. *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The right to counsel is thus the right to the *effective* assistance of counsel. *Id.* at 686, 104 S.Ct. at 2063. And as the court stated in *Evitts*, this right, too, has due process underpinnings. It

> is addressed to the action of the state in obtaining a criminal conviction through a procedure that fails to meet the standards of due process of law. "Unless a defendant charged with a serious offense has counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself.

> When a state obtains a criminal conviction through such a trial, it is the state that unconstitutionally deprives the defendant of his liberty."

*Evitts*, 469 U.S. at 396, 105 S.Ct. at 836 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980)). This is not to say that a convicted defendant can obtain an easy reversal of his or her conviction based upon the allegedly deficient performance of counsel. To prevail on such a claim, the convicted defendant must first show that counsel's performance was deficient in the sense that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, and that counsel's deficient performance prejudiced the defense.

To satisfy *Strickland*'s deficiency component, the convicted defendant must show that counsel's performance fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064. This means identifying acts or omissions of counsel that could not be the result of professional judgment. *Id.* at 690, 104 S.Ct. at 2065. The defendant must overcome a strong presumption that counsel rendered reasonably effective assistance, *id.* at 690, 104 S.Ct. at 2066, and convince the reviewing court that, "in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance," *id.* Notwithstanding this strong presumption, we agree with the district court that Thomas's attorneys' failure to file a brief on his behalf on the State's Rule 604(a)(1) appeal from the state trial court's suppression order constituted ineffective assistance of counsel in violation of the Sixth Amendment. His attorneys' failure to file a brief on his behalf could hardly be a "considered decision 'based on strategy,' but was instead merely conduct 'grounded in negligence.'" *See Siverson v. O'Leary*, 764 F.2d 1208, 1215 (7th Cir.1985). That Thomas's attorneys moved for an extension of time in which to file a brief on his behalf cannot make up for this. However much Thomas's attorneys intended to advocate

effectively Thomas's side of the case on the Rule 604(a)(1) appeal, they did not.

Our finding that Thomas's attorneys' performance was deficient under *Strickland,* however, does not end the inquiry. Respondent O'Leary argues that, even if Thomas received deficient assistance from his attorneys on the State's Rule 604(a)(1) appeal, he still cannot satisfy *Strickland's* prejudice component. To satisfy that component, the defendant normally "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068, with "reasonable probability" meaning "a probability sufficient to undermine confidence in the outcome." *Id.* Thus, a defendant claiming that his attorneys failed to assert effectively his Fourth Amendment rights normally must "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986).[1]

But we do not think *Strickland's* prejudice component is applicable to this case. For in situations where there has been an "actual or complete denial of the assistance of counsel altogether," "where prejudice is so likely that case-by-case inquiry is not worth the cost," prejudice is presumed. *Id.* 466 U.S. at 692, 104 S.Ct. at 2067. As the Court stated in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984),

> there are ... circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particu-

lar case is unjustified.... Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.

*Id.* at 658–59, 104 S.Ct. at 2046–47. In *Siverson, supra,* we considered carefully the Court's language in both *Strickland* and *Cronic* and determined that

> although cases in which defense counsel is unavailable during a critical stage of the proceedings bear some similarity to the kinds of situations that raise typical ineffective assistance of counsel claims, ... *Strickland* and *Cronic* convinces us that the Court does not intend for the *Strickland* test to control the former class of cases. The crucial premise on which the *Strickland* formula rests— that counsel was in fact assisting the accused during the proceedings and should be strongly presumed to have made tactical judgments "within the wide range of professional assistance"—is totally inapplicable when counsel was absent from the proceedings and unavailable to make any tactical judgments whatsoever.

*Siverson,* 764 F.2d at 1216. We thus concluded that, under *Cronic* and *Strickland,* "a defendant need not affirmatively prove prejudice under the second prong of the *Strickland* test in order to establish a Sixth Amendment violation based on the lack of defense counsel's assistance at a critical stage of the criminal proceedings." *Id.*

In this case, Thomas's attorneys' failure to file a brief on his behalf on the State's Rule 604(a)(1) appeal from the trial court's

---

1. In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme court held that because Fourth Amendment rights ought to be litigated at trial, defendants cannot invoke federal habeas review to attack Fourth Amendment errors. *Kimmelman* departs from this prohibition only where a defendant claims that the failure to assert Fourth Amendment rights constituted ineffective assistance of counsel. *Kimmelman,* 106 S.Ct. at 2585 & n. 3. Acknowledging that some guilty defendants might be freed by this exception, the Court wrote,

> [W]e have never intimated that the right to counsel is conditioned upon actual innocence. The constitutional rights of criminal defendants are granted to the innocent and the guilty alike. Consequently, we decline to hold either that the guarantee of effective assistance of counsel belongs solely to the innocent or that it attaches only to matters affecting the determination of actual guilt.

> *Id.* at 2586.

suppression order amounted to a complete denial of assistance of counsel during a critical stage. For purposes of the appeal, no brief meant no representation at all. Thus, in our view, Thomas is not required under *Strickland* and *Cronic* to prove that the denial of his right to effective assistance of counsel on the appeal prejudiced the outcome of his case in order to make out a constitutional violation.

### C.

As the Supreme Court recently reiterated in *Satterwhite v. Texas*, —— U.S. ——, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), however, "not all constitutional violations amount to reversible error." *Id.*, 108 S.Ct. at 1797. Generally,

> if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error is harmless and the verdict may stand. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The harmless error rule " 'promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' " *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)).

*Id.* Respondent O'Leary urges us to find Thomas's constitutional deprivation harmless. He argues that harmless error analysis is appropriate in light of our decision in *Siverson*, in which we held that when an attorney voluntarily leaves the courtroom during a critical stage of the trial, the defendant need not affirmatively prove prejudice under *Strickland*. *Siverson*, 764 F.2d at 1217. Rather, we held that the burden shifts to the government to prove that the error was harmless beyond a reasonable doubt under *Chapman*. *Id.*

But as the Court also pointed out in *Satterwhite*, "[s]ome constitutional violations ... by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite*, 108 S.Ct. at 1797. According to the Court, "Sixth Amendment violations that pervade the entire proceeding fall within this category." *Id.* Unfortunately, just what types of Sixth Amendment violations "pervade the entire proceeding" and "cast so much doubt on the fairness of the trial process that ... they can never be considered harmless," *id.*, is not altogether clear under *Satterwhite* and the Court's previous cases discussing the proper instances for the invocation of a harmless error analysis. We are confident, however, that the constitutional error in *Siverson* did not fall into that category. We held in *Siverson* "only that counsel's voluntary absence during jury deliberations and the return of the verdicts in that case was not the kind of Sixth Amendment deprivation that 'by its nature, cannot be harmless,' and therefore that it was subject to harmless error analysis." *Siverson*, 764 F.2d at 1217–1218 n. 6. And because we had before us "an extensive record providing more than a sufficient basis to perform a meaningful and thorough harmless error analysis," we deemed it appropriate to conduct that analysis on appeal rather than remand to the district court for reconsideration. *Id.* at 1218.

Indeed, the ability to identify readily the scope of a constitutional error from the record of the proceedings is essential before a court can properly invoke a harmless error analysis. In *Satterwhite*, for example, the Court explicitly stated that harmless error was inappropriate in situations where there has been a "conflict of interest in representation throughout the entire proceeding" (*see Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)); a "total deprivation of counsel throughout the entire proceedings" (*see Chapman, supra*, 386 U.S. at 23 n. 8, 87 S.Ct. at 828 n. 8 (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963))); and "an absence of counsel from an arraignment proceeding that affected the entire trial because defenses not asserted were irretrievably lost" (*see White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Hamilton v. Alabama*,

368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961)). *Id.* Each of these examples were "cases in which the deprivation of the right to counsel affected—and contaminated— the entire criminal proceeding." *Id.,* 108 S.Ct. at 1798. Moreover, "[s]ince the scope of a violation such as the deprivation of the right to conflict-free representation cannot be discerned from the record, any inquiry into its effect on the outcome of the case would be "purely speculative." According to the Court,

> in the normal case where a harmless error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to pretrial negotiations and in the sentencing process.... Thus, any inquiry into a claim of harmless error here would require, unlike most cases, unguarded speculation."

*Id.* (quoting *Holloway,* 435 U.S. at 490–91, 98 S.Ct. at 1181–82 (emphasis original).

**2.** At the same time, some of the Court's language in *Satterwhite* cuts in the other direction—toward applying a harmless error analysis in this case. For in *Satterwhite,* the Court refused to adopt petitioner's argument that the violation of his Sixth Amendment right to consult with counsel before submitting to a psychiatric examination designed to determine his future dangerousness required automatic reversal. Despite its earlier statement in *Holloway* that "'when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic,'" the Court found that the effect of the Sixth Amendment violation in *Satterwhite* was limited to the admission into evidence of the examining psychiatrist's testimony. The Court then noted that it had "permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial." *Satterwhite,* 108 S.Ct. at 1798:

> In *Milton v. Wainwright,* 407 U.S. 371 [92 S.Ct. 2174, 33 L.Ed.2d 1] (1972), for example,

We cannot help but find that the denial of Thomas's right to the effective assistance of counsel on the State's Rule 604(a)(1) appeal contaminated the entire proceeding below *and* that any inquiry into its effect on the outcome of the case would be purely speculative. As already noted, the issue whether to suppress Thomas's and Clark's statements was crucial to Thomas, perhaps even determinative of whether he would be tried at all. The suppression order at the trial level was a crucial blow to the prosecution; the appellate court's reversal of that order spelled doom for Thomas. In practical terms, then, this was the key battle of the trial. But because the appellate proceeding was nonadversarial, we cannot possibly know what would have happened had Thomas's side of the case been briefed on the appeal. We have no idea whether a brief on Thomas's behalf would have made legal or factual arguments that might have swayed the appellate court's decision on the merits of the suppression issue. On the other hand, we do have a good idea of the tremendous value of legal briefs and, in many cases, oral argument, to appellate courts. And we cannot ignore that at the trial-level suppression hearing, when the legal battle was fair and both sides were adequately represented, Thomas won.[2] At bottom, we be-

> the Court held the admission of a confession obtained in violation of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), to be harmless beyond a reasonable doubt. And we have held that harmless error analysis applies to the admission of identification testimony obtained in violation of the right to counsel at a postindictment lineup. *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (capital case); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Just last year we indicated that harmless error analysis would apply in a noncapital case to constitutional error in the use of a psychological evaluation at trial. *Buchanan v. Kentucky,* 483 U.S. ——, ——, n. 21, 107 S.Ct. 2906, 2912 n. 21 ... [97 L.Ed.2d 336] (1987).

*Id.* Accordingly, the Court held in *Satterwhite* that "the *Chapman* harmless error rule applies to the admission of psychiatric testimony in violation of the Sixth Amendment right set out in *Estelle v. Smith.*"

The constitutional error in this case, of course, resulted in the admission of Thomas's

lieve that the constitutional error in this case so infected the integrity of the proceedings against Thomas that application of a harmless error analysis is unwise and inappropriate.

■ Finally, as we noted in *Siverson,* a court

is not always without responsibility in situations when a defendant is without the assistance of counsel during a critical stage of the proceedings. Such situations are frequently "easy to identify," and the court can help protect the defendant's rights by at least insuring that the defendant is aware of and understands the right to have counsel present, and, should the defendant then choose to waive this right, obtaining a waiver on the record.

*Id.* at 1217. In this case, however, the Illinois Appellate Court determined that no oral argument or brief from Thomas was necessary, notified *only* the State of that decision, then decided the case against Thomas without referring to his pending motion for an extension of time in which to file a brief, which, not surprisingly, the court denied eight days later. This does not strike us as a procedure mindful of the responsibility to help protect the defendant's rights by at least insuring that the defendant is aware of and understands the right to have counsel present. Here, the Illinois court knew that Thomas's attorneys

intended to file a brief on his behalf, yet went ahead and decided the appeal without hearing from them. Respondent O'Leary, in defense of the Illinois Appellate Court, informs us that the court's handling of this case is not unusual, but if that is supposed to convince us that its actions in this case were fair to Thomas, we are not persuaded.

The net result of the Illinois Appellate Court's actions, coupled with Thomas's attorneys' constitutionally deficient advocacy on his behalf, was that Thomas had nobody looking out for his rights on the State-initiated Rule 604(a)(1) appeal, a critical stage of the proceedings. Thomas lost, and the result was devastating. Although we cannot know what would have occurred absent the constitutional breakdown, we do know that its occurrence is unacceptable, and we refuse to find it harmless. The State, then, has three choices: release Thomas, retry him, or conduct a second appellate review of the state trial court's suppression ruling, this time making sure that Thomas has constitutionally adequate representation.

AFFIRMED.

and Clark's statements at Thomas's trial. The Court's discussion and citation to *Milton* in *Satterwhite,* then, indicates that the violation here may fall within the pool of Sixth Amendment violations subject to harmless error analysis. But the above dicta in *Satterwhite* is somewhat troublesome. In *Chapman,* for example, in noting that there are "some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," 386 U.S. at 23, 87 S.Ct. at 827, the Court cited as an illustration *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), in which the Court held that the admission of a coerced confession required automatic reversal. In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), a case decided after *Milton,* the Court affirmed this same principle. Since the impact on a trial of the confessions obtained through the constitutionally impermissible means involved in *Milton* and *Mincey* would, in theory, be the same, it is difficult to see why harmless error applies to one and not the other.

In any event, because the facts of this case differ enough from those in each of the above cases, we believe none of them is controlling. As noted, the error in this case occurred on the State-initiated *appeal* from the trial court's suppression hearing, which the State lost. As the Court emphasized in *Evitts,* appeals differ greatly from trial court proceedings, and the value of counsel in assisting the appellant through brief or oral argument cannot be questioned. Notably, the Court in *Evitts* did not apply a harmless error analysis to the constitutional violation that occurred in that case. Presumably, the Court could have examined the record of the proceedings below to determine whether any of the petitioner's alleged bases for reversal had merit and, on that basis, decided whether the dismissal of petitioner's appeal was harmless. But it did not do so. *Evitts,* then, indicates that it is improper to find the dismissal of an appeal despite the ineffective assistance of appellant's counsel constitutionally impermissible, but at the same time deem it harmless error.